THIS case was on a rule to show cause why an information in the nature of a writ of quo warranto should not be filed against James Martin for usurping the office of sheriff of New Castle County, which was granted upon the petition of Purnal J. Lynch, supported by the affidavit of Thomas Toy, hereafter referred to, stating that at the general election held in New Castle County on the 7th day of November, A.D. 1882, James Martin, the respondent, George J. Pennington and the petitioner were candidates for the office of sheriff of New Castle County; that by the official count made by the board of canvass it appeared that the said James Martin had received seven thousand nine hundred and eighty-six votes, the said Pennington sixteen votes and your petitioner seven thousand nine hundred and seventy-seven votes, and that two scattering votes were cast for other persons named in the petition; and that said Martin had received a plurality of nine votes over your petitioner, that a majority of the board of canvass certified to the Governor of the State that said Martin had been duly chosen sheriff of said county, that the governor, on the 16th day of November, commissioned Martin as sheriff, and that the later had subsequently qualified by taking the oath of office and entering into recognizance as required by law; that in four election districts of said county, named in said petition, there were eighty-five ballots cast for said Martin by persons who were not legally qualified *Page 489 
to vote, all of which ballots were counted for him; that after deducting the said illegal ballots from the whole number counted for him, there would remain a plurality of seventy-six votes for said office in favor of your petitioner. The petitioner further averred, upon information, that about two hundred other ballots were cast for the said Martin by persons not legally qualified to vote, and that he was not duly elected to said office, but had unlawfully usurped the same. The jurat to the petition was in the usual form, and stated that what was contained therein, so far as it concerned the petitioner's own act and deed, was true, and that what related to the act and deed of any other he believed to be true. In support of the petition there was only one affidavit filed, that of Thomas Toy, who deposed that on the day of the said election he was present at the voting place in Christiana north election district from the opening to the closing of the polls on that day, and that on that day and at the said voting place there were cast thirty votes for James Martin for the office of sheriff of said county by persons who were not then residents of said election district, and that none of said persons had within two years next before said election paid a county tax which had been assessed at least six months before the said election, but, in fact, they voted in said district on forged tax receipts.
Bradford (Higgins with him) for the respondent. The respondent has, in showing cause under the rule laid, filed his own affidavit denying the allegation of the petition, and in support of that affidavit has filed the respective affidavits of James J. Vincent, the inspector of election in Christiana north election district, Charles Green, one of the judges of election in said, election district, Henry Du Pont, Joseph Knox and Benjamin F. Sheppard, contradicting the statements in Toy's affidavit as will hereafter more fully appear. The granting of leave to file an information in the nature of a quo warranto, both in this country and in England, is within the sound discretion of the court upon consideration of the particular circumstances of each case. In Rex v. Sargent, 5 T. R., 466, where the issue was as to the residence *Page 490 
of the defendant, Lord Kenyon, Ch. J., says: "I cannot forbear reprehending the manner in which the prosecutor's case has been laid before the court; the affidavit on his part contains nothing but a loose general charge against the defendant. When Lord Mansfield first came into the court he found that informations in the nature of quo warranto were had almost for the asking; but he soon saw the impolicy and vexation of such a rule, and therefore before he granted any such application he canvassed the case, and unless he found strong grounds for questioning the defendant's title, he (and the court sitting with him) always refused to let the information go. Such is the conduct which I am inclined to pursue, and therefore I shall consider all the circumstances of this case." Rex v. Wardraper, 4 Burr., 1964; Rex v. Dawes,Ibid., 2022. In the case of Commonwealth v. Jones, 12 Pa. St., 365, on an application to file an information to oust a mayor, Gibson, Ch. J., says: "Now it is well known that an information at the suggestion of a relator was always preceded in this court by a rule to show cause, as it is in the Queen's Bench at this day. The court itself stood as an inquest between the accuser and the accused. No man would submit to the dispenser of corporate patronage, if nothing else were between him and vexatious prosecution than the magnanimity and justice of the displaced officer or disappointed applicant. The highest magistrate in the government, or the lowest individual in the community, may not be put to answer before he has had the inculpatory evidence submitted to an inquest; in the one case the House of Representatives, in the other a grand jury, and it would be strange if the law did not give the first magistrate of a great municipal corporation the same protection. The code of the freeman gave it to him, and the representatives of freemen have not taken it from him. Whatever change was made in matters of form, the legislature held fast to the substance of that jurisprudence which is the only sure foundation of national liberty."
The affidavits upon which the application for leave to file an information in the nature of a quo warranto is based should contain positive allegations of the facts upon which the relator seeks *Page 491 
to assail the title of the respondent, and should be complete and sufficient in every respect. High on Ex. Leg. Rem., § 733; Cole on Informations, 178, 182; Rex v. Sargent, 5 T. R., 466. And where the affidavits in support of the application are in themselves insufficient, the court will discharge the rule; as where the allegations of the affidavits are made on information and belief merely. Rex v. Newling, 3 T. R., 314; High on Ex. Leg. Rem. § 733. Or where the affidavits suppress some material fact. Rex v. Hughes, 7 B. C, 708, 719; Cole on Informations, 182, 190. Or where the application and affidavits unfairly state a case against the defendant in such manner that he is unable to answer it, although his title be good and he could make perfect answer to the case if fairly stated. Rex v. Jefferson, 5 Barn. Ad., 855.
In showing cause against the rule it is competent for the respondent to meet by counter affidavits the case made by the relator. High on Ex. Leg. Rem., § 738; Cole on Informations, 189; People v. Waite,70 Ill., 25; People v. Railroad Co., 6 Reporter, 457. And where the affidavits on the part of the relator are clearly and satisfactorily answered by those on the part of the respondent, the rule should be discharged. Rex v. Rolfe, 4 Barn. Ad., 840; Rex v. Orde, 8 Ad. El., 420; Reg. v. Quayle, 11 Ad. El., 511; Rex v. Sargent, 5 T. R., 466.
In the exercise of its sound discretion the court should discharge this rule because of the insufficiency of Toy's affidavit considered by itself and without reference to the counter affidavits. For it suppresses the names of the alleged illegal voters, and without their names it is impossible for the respondent to meet this charge made by the relator. It appears that there were eight hundred and twenty-one votes cast for the office of sheriff at the election in question in the said Christiana north election district, and it would be utterly impossible for any one to pick out the thirty votes alleged in Toy's affidavit to have been cast illegally. It could not be done if the voting had been by open ballots or viva voce. A fortiori it could not be done after an election held as this was according to the polity of this State by *Page 492 
secret ballot, and where no legal voter can be compelled to disclose for whom he voted. State Const., art. 4, § 1, Del. Laws, 16 vol., 332. If it were competent for the respondent to adduce oral evidence at this hearing, it would still be impossible for him by reason of the secrecy of the ballot to meet Toy's affidavit owing to its generality and uncertainty. It is no answer that he shows cause by affidavits, and not by oral evidence; for the same insurmountable obstacle presents itself to him. The respondent is called upon to show cause why this rule shall not be made absolute; therefore he has a right to show cause, and because he has this right the relator is bound to so state his case in his affidavit that the respondent can show cause, if any he has; and if the names of the alleged illegal voters had been given, the respondent would have had the means of meeting the charge and refuting that allegation by showing the legal qualification of every one of them, not only in respect to residence, but assessment and payment of tax; or if that could not then have been shown, the contrary could have been bo the entire satisfaction of the court; but without their names given, where do we all now stand, and must stand, with regard to the truth or falsehood of that allegation? Entirely in the dark. No sanction for such a course as this is found in the analogy or ruling in the cases already cited of Rex v. Orde, 8 Ad. EL, 420, and Rex v. Sargent, 5 T. R., 466. Nor should we omit to say that if that had been done, it might then possibly have been shown that although illegal, a majority, if not the whole of them, were cast for Lynch, and not for Martin. The court will not impose an impossibility upon the respondent, and before it will permit an information to be filed, will imperatively require the petitioner to fairly and fully state his case so that it can be fairly met and confronted on the other side, and in such a manner as to best afford the means of ascertaining the truth and the facts on which the justice and equity of the case depends. And as we see was done in the case cited of Rex v. Jefferson, 5 Barn. Ad., 855, in which this principle was fully recognized. In that case the scope of inquiry was limited to the list, of names contained in the relator's supporting affidavits, but here where the relator needs only to *Page 493 
prove according to his allegation the disqualification of thirty voters, he seeks to impose upon the respondent the almost endless task and burden of searching, ascertaining and showing to the satisfaction of this tribunal the legal qualifications of the entire poll list of eight hundred and twenty-one votes at the election in question. In the case of Rex v. Hughes, 7 Barn. C, 708, 719, it was held that the court should be more reluctant to make the rule absolute where the insufficiency of the relator's supporting affidavits is intentional and arises out of his suppression of material facts. If Toy does not know who the alleged illegal voters are, his affidavit is false and worthless, and the relator has no case. But if he does know, as was alleged by counsel for the petitioner in open court at the hearing, then the relator has wilfully suppressed the names of the alleged illegal voters, and is not entitled to any consideration at the hands of the court.
But the counter-affidavits of the respondent make more manifest the insufficiency of the relator's case as it is now presented to the court, for these affidavits show him to be unworthy of credit by directly contradicting his statement as to his presence at the polls, during that day. They, further, clearly show that it was impossible for him to know that illegal ballots were cast for Martin, if any were cast for him. They also conclusively show that Toy's affidavit could not have been based upon anything better than information and belief, which would be insufficient to sustain the rule. Nothing could be more erroneous than to contend that when a relator suggests merely a case coming within the jurisdiction of the court, and files an affidavit, however general and uncertain it may be, alleging jurisdictional facts, leave will be given to file the information. All the authorities recognize that counter-affidavits may be filed by the respondent, but of what conceivable use could such counter-affidavits be if the court were concluded by the relator's affidavit? Even where the relator's affidavits are unobjectionable upon their face, if counter-affidavits be filed, a question of fact is necessarily raised and presented to the court for its determination. Upon consideration of the affidavits on both sides, if *Page 494 
the court deem that a fair question of fact, attended with fair and reasonable doubt, has been fairly raised in such manner as to afford the respondent the opportunity to meet the case against him, the rule may be made absolute, but not otherwise. No more than this is meant by Lord Kenyon in what he said in Rex v. Mein, 3 T. R., 596. A review of the authorities will show that the courts have been governed by the peculiar circumstances of each case. For instance, Lord Kenyon himself, in Rex v. Sargent, 5 T. R., 466, discharged the rule upon affidavits of the respondent showing residence, as well as upon the insufficiency of the relator's affidavits as to residence. In Rex v. Orde the rule was discharged upon affidavits of respondent showing residence. In Rex v. Rolfe, where the question was as to the validity of an election held on particular days, it was said by Parke, J., "There might be a sufficient prima facie case to call on the party for an answer as to those particular days; but if that answer is given, enough is done to meet the application The rule will therefore be discharged."
The court will not hold that a doubt has been fairly raised when the relator's affidavits are of such a nature as to preclude the respondent from all opportunity to answer the. case made against him, or where the relator's witnesses in their affidavits swear only to conclusions of law, and not to substantive facts out of which those conclusions arise.
The court should be reluctant to make the rule absolute in this case, because the relator's petition shows that the prima facie title of the respondent is complete; and in the next place, owing to the peculiar rule respecting the burden of proof in quo warranto proceedings. High on Ex. Leg. Rem., §§ 712, 716.
Bates (Lore with him) for the petitioner.
The case presented for the consideration of the court upon the papers raises two questions: 1. It is alleged in the petition, and admitted in the respondent's answer, that the certificate of the board of canvass upon which the commission was issued to the respondent by the governor was signed by only eighteen out of thirty-two inspectors who composed the board of canvass. This *Page 495 
fact being admitted, there is raised the simple question of law as to whether the statute (Rev. Code, 124, chap. 18, § 29) requiring that all of the inspectors present should sign the certificate of election, is satisfied by the signature of eighteen out of thirty-two. This is a question of law proper to be raised in such a proceeding, and should not be determined in favor of the respondent upon a rule to show cause, inasmuch as no writ of error would lie, and it is held that, upon a matter of doubtful law, the court will not usually decide in a summary manner upon argument of the rule, but will make a rule absolute, in order that the question may be raised upon the pleadings and finally determined. Cole on Crim. Inf., 192 (56 Law Lib.). 2. The other objection to respondent's title is, that a number of illegal votes were cast for him, which, if deducted from his aggregate vote, would leave a plurality of votes in favor of the relator. It is manifest that, under our system of jurisprudence, this proceeding is the only one available for making an inquiry into the result of a popular election, as determined and announced by the legal canvassers.
It is certainly very important that there should be some method to bring the result of popular elections under a course of judicial scrutiny, as opposed to the necessarily ministerial adjudication of the election which is made by the board of canvass. Whether this is the best system or not is not what we have to consider. The fact remains, that to the defeated candidate for an office so high as that of sheriff — the highest office in the county — the only method of investigating the data on which the result ascertained by the board of canvass is predicated is by an application to this court, such as we have made here. It is apparent, from the very nature of the* proceedings, that this matter now before the court is not a trial either of the facts or of the law applicable to this case. The proceedings on a quo warranto information are only permitted to be entertained by leave of the court, differing in that respect from other actions respecting personal rights of property not for trial at that time, but only in order that the court may see in advance that it is *Page 496 
such a case as should be properly submitted for trial under the exercise of that jurisdiction.
There are difficulties which your honors will understand very well from the merest suggestion. There would be difficulties in presenting an application of this kind on any species of proof which would be required in an ordinary trial of any issue of fact before a court and jury. It would be almost impossible to support an application of this kind with such proof as would be required in such a trial of any issue of fact before a court and jury. The present case illustrates that difficulty, perhaps, as well as any which could be put. The allegation here is, that the acting sheriff received his apparent majority by virtue of the illegal act of the parties who were supporting his election. Manifestly, the difficulties in the way of presenting before your Honors voluntary proofs of the acts of parties who have been so much interested in the election of the one candidate or the other as to violate the law in order to secure his election, must be so great as to render it practically impossible, if you apply to such a hearing as this the rigidity of procedure which has been contended for on the other side. The procuring of affidavits voluntarily made in support of this petition is one thing; the bringing up of parties without their consent by process of the court, and compelling them to testify, is a very different thing. The purpose of the present application is simply for the court to ascertain whether it is a case proper for the exercise of this jurisdiction. The application calls upon the respondent, requiring him to put his right beyond dispute. At the return of the rule, unless a respondent "shows such cause on the return as to put his right beyond dispute, the rule for the information will be made absolute, in order that the question concerning the right may be properly determined." High on Ext. Leg. Rem., § 731. "If these affidavits, and the cause shown, do not put the matter beyond dispute, the rule will be made absolute." Bull. N. P., 210; People v. Richardson, 4 Cow., 106. The rule has been very clearly stated in Rex v. Mein, 3 Term, 596, by Lord Ch. Just. Kenyon: "Lastly, it is objected, that the evidence of the defendant outweights that of the relator. Now, admitting it to *Page 497 
be so, that has never been held to be an answer to an application of this kind."
"Where there is evidence on both sides, the jury are the constitutional judges on which side the balance inclines. All that we are to look to is that a fair doubt is raised, and that the party applying comes with clean hands and in proper time."
Upon this point it must be remembered that "if the affidavits on both sides be conflicting, the court does not usually take upon itself to decide a doubtful matter of fact upon affidavits." Cole on Crim. Inf., 191 (56 Law Lib.). This text writer, on the preceding page, enumerates the objections which may be set up against a rule to show cause, and it will be observed that all the objections named are rather of a technical character, going to the jurisdiction, or were such defences as render the proceeding inapplicable. In none of them is there any support for the doctrine that the hearing of this rule is a trial of the merits of the case; neither is there to be found any support for the contention that the affidavits filed by the relator should be drawn with the precision of special pleading, or should contain the details of evidence.
In the present case, if the truth of the relator's affidavits be admitted, there can be no question as to their sufficiency. This test shows that the effort of the defence is to raise an issue as to the truth of the facts sworn to in behalf of the application, and it is just such a controversy as, upon the authorities cited, will not be determined upon a hearing like this. But an examination of the affidavits filed by the respondent shows that they do not, in fact, contradict the relator's affidavit in any material point, and even in the immaterial point, as to the presence of Mr: Toy which was much dwelt upon in the argument, the contradiction is apparent and not real. Toy's affidavit was that he was all day at the voting place. The respondent's affidavits which apparently were all originally framed in the same language, state that he was absent from the polls at different periods during the day; but Mr. Du Pont's affidavit, drawn like the others, is interlined in such manner as to show that what the affiants meant by absence from the polls was absence from the window. Doubtless, *Page 498 
if they bad all read their affidavits with the same care that Mr. Du Pont did they would have been corrected in like manner. As to the material points, Toy swears positively that there were cast thirty votes by persons who were not residents of the election district. The counter affidavits merely set forth that the affiants did not know or believe that there were any illegal votes cast. The respondent's affidavits are negative in their character, and must be subject to the general principle applying to negative testimony. It was objected on the other side that the statement in Toy's affidavit was a conclusion of law. That it was not so, is readily illustrated. If he had sworn simply that thirty illegal votes were cast, that would have been a conclusion of law. On the contrary, he states the specific facts which made the votes illegal; that a certain number of votes were cast by persons not residents of the election district. But it was urged that this statement of fact was not sufficiently specified. These affidavits are not pleadings, and no authority has been shown for the proposition that it was necessary to specify the names of the illegal voters. If there were such necessity, it is impossible that the text writers, one in England and one in this country, should have absolutely overlooked this requisite; nor is it possible to assume that the research of the counsel for the respondent would not have found such a case, if there were one. Having set up this necessity as an answer to our affidavits, it is incumbent upon them to satisfy the court that such is the law. Nor upon principle can any reason be given for such particularity at this stage of the case. The purpose of such affidavits is not specification, because no question of fact is to be tried, and the object of specification in all eases is to advise the other party of what he must be prepared to meet by witnesses at the bar of the court. But the objects of affidavits in this case is to inform the court of the nature of the objection to the respondent's title, and not to advise his counsel what evidence they must be prepared with in support of or against the alleged defect of title at a trial of the facts. Upon the consideration of such a rule the first inquiry is whether the office is one for the exercise of this jurisdiction? That it is so was admitted. *Page 499 
The next inquiry is as to the nature of the defect in the title.
Inasmuch as our application admits that the respondent holds under a commission from the government issued upon a certificate from the board of canvass, it is only necessary that our affidavits should satisfy the court that the defect of title upon which we rely is such an objection as would, if supported by evidence, warrant an investigation as against the governor's commission. That defect is that illegal votes were cast for Martin in sufficient numbers to reverse his majority. But it was argued that the allegation of illegal voting was not sufficiently specified and could not be met. The answer to this is that it was not required to be met at this time. If it be held that the respondent's affidavits sufficiently deny the allegation that thirty illegal votes were cast, then there is presented to the court a conflict of evidence which upon the authorities is a matter proper to be investigated upon a trial. If it were the practice of the court to permit the respondent to bring witnesses at the bar of the court to controvert the allegation of the petition and affidavits accompanying it, then the objection raised that the allegations were not sufficiently specified, would be a good one. The necessity of the minuteness contended for would be a question to be determined upon the pleadings hereafter. It would be contrary to public policy to require in such a case that there should be laid before the court here the names, even if we were able to do it, of the parties who voted illegally in Christiana hundred. If we were able to specify the names of every one of the thirty alleged illegal voters, we ought not now to be compelled to disclose them, in view of the fact that these men being illegal voters, the disclosure of their names would make it absolutely impossible to reach them at the time they were required by the process of this court. The fact relied upon is that thirty illegal votes were cast. The affidavit is positive to that effect; it is offered in" good faith, with the expectation that when the proper time conies with the aid of the process of this court we can make satisfactory proof of it.
The sources of knowledge of an affiant are not the proper subject of investigation here. It is an unprecedented suggestion *Page 500 
that upon a positive affidavit required for the institution of legal proceedings the court should be asked to speculate as to the sources of the affiant's knowledge. What object would be gained in this proceeding by giving the names of the voters, even if we were able to do it? None at all. It would stand before the court just as it does now; it would not vary the issue here or the question presented to the court. There would remain the question of fact to be tried upon the information and subsequent pleadings. There is therefore nothing to be gained by greater specification, and that should not be required unless some good reason be given for it. It could have no effect except to encumber the record here with details of proof which should be properly brought out upon the trial. It was urged that, inasmuch as the burden was cast on the respondent of proving his own election, the affidavit of Toy was one that could not by any legal possibility be met. Upon this foundation an ingenious argument was presented which formed the main objection to the sufficiency of the relator's affidavit. The argument rests upon a fallacy. It is not necessary for the respondent to prove his own election; the burden which the law casts upon him, if leave be granted to file an information, is to show by what warrant he exercises the office of sheriff. He relieves himself of that burden and makes a good plea in behalf of the information, when he pleads the ascertainment of the plurality of nine by the board of canvass, and showing the commission of the governor in pursuance of it. In fact it is doubtful whether he would be required to do more than to plead his commission. Upon such a plea the State could with safety neither demur nor take issue; it would be compelled to reply by way of confession and avoidance, and to set up affirmatively such frauds or illegal voting, or other matter of that nature, as would be sufficient to afford a satisfactory answer to the plea, and upon such a replication the burden would rest upon the State to prove the facts alleged in it.
Sufficient evidence to support a plea of the respondent's commission exists upon the records of this court, and he therefore is in a position, as shown by the petition itself, to shift from himself the burden concerning which so much was said, without *Page 501 
bringing a single witness. Certainly, whatever burden rests on himin limine is met by the production of his commission. That this view is correct is clearly shown by the case of The People v.
Vanslyck, 4 Cow., 297. In this case the pleadings are reported in full. The respondent, who was a sheriff, pleaded simply his election and qualification, and this was treated as a good plea in bar and replied to specially in a variety of replications all of which confessed the election and set up matters by way of avoidance. Every consideration of public policy demands that the purity of the elective franchise shall be maintained and fraud exposed and punished. This can be most successfully accomplished by such a judicial inquiry into election frauds, as will deter like attempts in the future. It is therefore important that mere technicality should not be permitted to interpose against the fullest and freest examination of such frauds in any case.
The decision of the court in this case will be final. If, by such decision, the rule shall be discharged upon a mere technical point, it may deprive the relator of an office to which he may have been fairly elected, and confirm the title of the respondent who it is claimed is holding his office by reason of fraud. The importance of the decision is therefore greatly enhanced by the fact that it cannot be reviewed, and determines summarily the right to an important office without giving the relator an opportunity to prove the facts upon which his right is based.
This is an application by Purnal J. Lynch, who was a candidate for the office of sheriff of New Castle Comity at the general election, held on the 7th day of November last, for a rule upon James Martin — also a candidate for that office at the same time, and who having received a certificate of his election from the board of canvass, and a commission from the governor, and also entered into recognizance according to law, and been duly qualified according to the constitution of the United States and the constitution and laws of this State, is in the exercise of the duties of said office — to show cause why an information in the nature of a quo warranto should not be filed *Page 502 
and a writ issued requiring him to show by what warrant he holds the said office. The motion is supported by affidavits.
In showing cause against the rule, the respondent's counsel filed affidavits in behalf of their client.
They also took the ground, among other points, that the affidavits in support of the rule are in themselves insufficient for the purpose. If that be so, then the rule must be discharged.
There does not appear to be any system of rules with respect to affidavits, but it may be taken as a fact that in all affidavits filed as the foundation of proceedings to open election by ballot and inquire into the right to vote of persons who did vote thereat, there should be set forth the names of the alleged illegal voters, where illegal voting is the allegation; if their names are unknown it should be so stated, and some mode or means of identification given, for the reason that the affirmative of the issue in quo warranto of this character is upon the respondent. Although it may be sufficient for him, in his plea to the writ, to allege his commission, recognizance and qualification by having taken the oaths of office, yet upon a replication setting forth facts affecting the legality of votes cast or of the election itself, he would be compelled to traverse those facts, if material and properly alleged, and tender issue, the maintenance of which would be upon him. Now, if it were sufficient simply to allege in the relator's replication that a certain quantity or number of illegal votes were cast for the respondent at certain polls, without giving the names of the voters, how, if the issue should be made up by a traverse of that averment (as it would have to be if such an allegation in an affidavit were sufficient), would it be possible for the respondent to produce the proof that such quantity or part of it was legal? He could not do it except by negative testimony, and that will not support an affirmative allegation The pleadings in quo warranto must have the same legal qualities as those in other cases; in fact, from the quasi criminal nature of informations, they should have the same elements of certainty as an indictment. And the same is true, of course, of the affidavits upon which the writ is founded, though no consequence would be given to defect of mere form. Take the case *Page 503 
of any affidavit as the foundation of legal process, civil or criminal, and it must set forth facts in a direct, plain and circumstantial manner, in order to show the defendant just what he will be called upon to answer. And this is particularly true where, as here, affidavits may be answered by affidavits. Without particular statement, there is no means by which a defendant can do more than deny the allegation, such as it may be.
The relator in this case charges the casting of illegal ballots at several voting places, but he does not state the name of any voter who cast them, nor does the other affiant, Thomas Toy, with respect to those alleged by him to have been cast at the polls where he was present. Is not, therefore, the affidavit, in such case, but a loose, general charge of fraud and illegality, in the sense in which the phrase is used by Lord Kenyon in Rex v. Sargent, 5 T. R., 466? And we have not been pointed to any case where the names of the alleged unqualified voters were not set forth in the proceedings; in fact, I have seen but one case where the illegality of voting by ballot was the ground of the application, and in it (Rex v. Jefferson, 5 Barn. Ad., 855) lists of the alleged illegal voters appeared by affidavits. How is any issue to be made up by trial, without notice by the pleadings, so as to confine the proof to them? What votes are to be investigated on the ground of illegality? If none can be made up on the allegations in relator's affidavit (which alone can appear in the writ of quo warranto), none can be made up at all. This would seem to be conclusive.
But, further, every affidavit in any case ought to be so framed as that an indictment would lie upon it if the party taking it swear falsely. This is the view taken by Buller, J., in the above-cited case of Rex v. Sargent. In that case he said: "The prosecutors swear to no facts whatever. No indictment could be founded on their affidavits."
In this case what sort of indictment could be founded on the affidavit of either Lynch or Toy with respect to illegal votes, the material subject of it? Only one, and this would require the State to show affirmatively the right of every voter to take part in the election; it could not be done inferentially; it would *Page 504 
not be enough that no votes were objected to. The State cannot be debarred of her right to prosecute for perjury by defectively framed affidavits, nor can the respondent in this case be put to the trouble and expense of litigation to support his right to his office, unless he may know beforehand, from the prosecutor's affidavit, whose votes they are the legality of which he is required to maintain. The affidavits should show this definitely and although, as has been said, there does not appear to be any system of rules with respect to affidavits, there are still certain requirements with respect to some of them that indicate what should be adopted as rules in cases of affidavit for quo warranto informations. In affidavits to hold to bail — that in affidavits of cause of action — due certainty is required. It is an invariable and regular rule that the affidavit must be as positive as the nature of the case will admit. Pomp v. Ludvigson, 2 Bur. 655; 1 Sel., p. 105. As the affidavit must be positive with respect to the actual existence of the debt, so it must be certain as to the description of the cause of action. Ibid., 108. The affidavit must be clear, certain and correct in the language in which it is drawn. It should be such an oath as a perjury can be assigned upon. The most trifling inaccuracy or clerical mistake, therefore, will render it defective, as where an affidavit of debt was made that defendantin indebted, instead of is indebted, the court held it defective and as no affidavit, and discharged defendant on common bail, because no perjury could be assigned upon it. Ibid., 109; Reeks v. Groneman, cited 2 Wil., 225. In the court of common pleas in England supplementary affidavits were allowed, but "only allowed where the original affidavit is in itself a good one, such as perjury can be assigned upon." Ibid., 115. This is sufficient to show the degree of certainty required in affidavits of cause of action — which, in effect, the relator's affidavits are — and will make plain the remark of Justice Butler, before quoted.
Suppose the knowledge of the affiants not to be loose, as well as their affidavits, where was the difficulty in naming the illegal voters? How can we imagine, in fact, knowledge of illegal votes, and not at the same time knowledge of the names of those *Page 505 
who cast them? We cannot, for the name of every voter is announced audibly when he hands in his ballot. There was no difficulty, therefore, in giving the names of non-resident voters in this case. Neither could there have been any in the case of the alleged forged tax receipts upon which any one voted; for no valid receipts could be made by any person other than the" collector, and it was his duty to be present at the place of voting to receive taxes, from the opening to the closing of the polls, and he must be taken to have been there, no proof or suggestion having been offered that he was not.
Again, it appears, by the affidavit of Thomas Toy, that he was present at the place of voting in North Christiana district from the opening to the closing of the polls. Now, why did not he, or some other person of his side — for instance, the judge of the election of his politics — make objection to taking the votes of the thirty non-residents who used fraudulent tax receipts? It is not alleged in his affidavit that he or any one else opposed their voting, and (what is significant) it is not stated that no one knew of the fact of illegality of those thirty votes until it was too late to object. He would, most probably, have said so if such had been the fact. No objection was made, we may be sure, or proof would have been offered of the fact.
We have a case, then, of an application to make absolute a rule for a writ of quo warranto against a sheriff in office, with all the legal muniments of title and exercising its duties, upon two affidavits alleging no material fact which can be embodied in the writ in such a traversable shape as the rules of pleadings require, and upon which the affiants could be prosecuted for per-jury if they swore falsely. The certainty required in an indictment could not be observed except by averring what is sworn to as a negative fact, which averment would open an inquiry into the legality of every vote cast at the North Christiana polls for James Martin, with no power to make any man tell how he voted. Such a requirement would be wholly impracticable in its execution.
Upon the ground, therefore, of the insufficiency of the affidavits, not regarding the uncertainty of knowledge about the illegality sworn to, I think this rule should be discharged. *Page 506 
 Houston, J. The ancient writ of quo warranto for which an information in the nature of the writ seems to have become at an early period the general substitute, was a high prerogative writ in the nature of a writ of right for the king in the country from which we have derived it, against one who had usurped or claimed any office, franchise or liberty of the crown, to inquire by what authority he supported his claim to it, in order to determine the right. And as such offices, franchises or liberties in their origin pertain, as high prerogative rights, to the king exclusively, and could only be obtained and held by gift or grant from him, any one in the possession of such an office or franchise was commanded by the writ to show by what authority he held or exercised it, he was, of course, brought into direct, conflict with the king himself before the tribunal that was to try it, as claiming a high prerogative right pertaining to the sovereign alone, and which could only vest in a subject by actual grant to him or his ancestors. And, accordingly, in such a contest it was early ruled and established that it was absolutely incumbent upon the defendant in it to show to the satisfaction of the court that he had a good and valid title in law to the office or franchise in question, and if he failed to do so, it was pronounced a usurpation on the rights of the crown, and judgment of ouster was rendered against him. And the courts in this country have followed this ruling quite rigidly in cases of information in the nature of a writ of quo warranto, although we have no crown and no king and no prerogative rights under our epubliean forms of government and of popular elections to public offices such as the one now under consideration.
It was also at an early period equally well settled in the courts of England that an information in the nature of a writ of quo warranto should be granted as a matter of course whenever applied for in the proper form, but the propriety of the practice had before been questioned by Lord Mansfield and all the judges then sitting with him in the Court of King's Bench, as early as the year 1766, in the case of Rex v. Waroper, 4 Burr., 1963, in which after referring to a previous case which the court had discharged the rule obtained against the defendant, without sending *Page 507 
the question to a jury, he remarked in regard to the case then before the court that "it would be very grievous that the information should go of course. And it would be a breach of trust in the court to grant it as of course; on the contrary the court are to exercise a sound discretion upon the particular circumstances of every case." And the same court expressed the same opinion in the succeeding cases of Rex v. Dawes, 4 Burr., 2022, 2120, 2277; Rex v. Stacey, 1 T. R., 1. Some twenty years later, reaffirming the same principle, Lord Mansfield again remarked, "I remember when it was so much the practice of the court to grant quo warranto informations as of course, that it was held prudent never to show cause against the rule, for fear of disclosing the grounds on which the party went. But now, since these matters have come more under consideration, it is no longer a motion of course, and the court are bound to consider all the circumstances of the case before they disturb the peace, and quiet of any corporation." The corporation referred to was that of the borough of Winchelsea, and the point to be considered was whether one Marten was duly elected mayor of it, on which election the validity of the defendants' franchise, as a freeman of the borough, depended; the quo warranto information moved against him was to show by what authority he claimed the franchise. And the ruling on this point, as above stated, has been recognized and reaffirmed in all the cases of the kind which have followed it, both in that country and in this, until it is now become a settled rule that it is always in the discretion of the court to grant or withhold an information in this nature, and to this end that they are bound to exercise a sound discretion upon consideration of the particular circumstances in each case. Cole on Criminal Information, etc., 56 Law Libr., 165; High's Ex. Leg. Rem., § 605.
It has also been decided that when the evidence presented to the court in the affidavits for and against the rule to show cause, is conflicting, and is not such as to raise a fair doubt on which side the balance inclines upon the question of fact presented, the court should not grant the application, or make the rule absolute. The King v. Mein, 3 T. R., 596. And in a later case *Page 508 
Lord Kenyon states that the rule on this point in still stronger terms, which was upon a rule on the defendant to show cause why an information in the nature of a quo warranto should not be filed against him for exercising the office of bailiff of the borough of Seaford, the charter of which provided that the inhabitants and tenants resident in it should annually elect on the day stated some person from among themselves to be the bailiff of it, and the affidavits on the part of the relator stated "that the defendant was not resident within the borough at the time of his election, as was required and made necessary by the charter, or according to the true meaning and intent of the same," which was contradicted by affidavits on behalf of the defendant to the effect that he had rented a house in the borough on the 28th of September preceding for one year, and that he and his servant had slept in it that night, and quitted Seaford the next day after the election, but he had been there again, and resided and slept in the same house on the 23d and 24th of October last. For the relator it was argued that this was a mere colorable residence; and further that whether it was a colorable or abona fide residence, was a question of fact for the consideration of a jury; and the very circumstance of its being disputed was decisive to show that the rule should be made absolute in order that the jury might determine that question. But Lord Kenyon, C. J., said "I cannot forbear reprehending the manner in which the prosecutor's case has been laid before the court; the affidavits on his part contain nothing but a loose general charge against the defendant. When Lord Mansfield first came into this court he found informations in the nature of a quo warranto were had almost for the asking, but he soon saw the impolicy and vexation of such a rule; and therefore before he granted any such application he canvassed the case, and unless he found strong grounds for questioning the defendant's title, he (and the court sitting with him) always refused to let the information go. Such is the conduct which I am inclined to pursue; and therefore I shall consider all the circumstances of this case." The King v. Sargent, 5 T. R., 466. These cases have been followed by so many rulings to the same effect in England that Mr. Cole, an English *Page 509 
writer of acknowledged authority on the subject, says that this is now the settled doctrine in the courts of that country. Cole on Criminal Information, etc., 56 Law Libr., 165. And it also appears to have been as generally recognized in the courts of this country, among which we have a case in the time of Gibson, C. J., In Pennsylvania, in which he even likened the status of the court in such a case to that of an inquest between an accuser and the accused, to which the inculpatory evidence should be submitted before he could be sent before a jury to be tried for the alleged usurpation. Commonwealth v. Jones,12 Pa., 365.
It has also been held that to entitle a party to such an information on the ground that the person holding the office had not been elected by a majority of the legal votes, the relator must by affidavit make out aprima facie case to the satisfaction of the court. Rex v. Mashiter, 6 Ad. and Ell., 153; 1 Nev. and P., 314; Rex v. Sanford, 1 Nev. and P., 328; and at this stage of the proceeding the court becomes the judges of the evidence, as well as of the law in the case, and of the weight and credibility of the testimony produced before them when the affidavits filed for and against the application are contradictory in their character. In the case before us there is but one affidavit on behalf of the relator, Purnal J. Lynch, in addition to his own annexed to his petition in the usual form, in support of the allegations contained in it, while on behalf of the respondent, Martin, there are five affidavits filed in addition to his own annexed to his answer, also in the usual form. The only disputed matters of fact alleged and deposed to by the relator in his petition are as follows: that at the general election held in New Castle County on the 7th day of November last in which he and the respondent were the principal competing candidates for the office of sheriff, and in which, according to the official returns of it, the respondent received but seven more votes than he did for the office, there were cast by divers persons not legally qualified to vote, a large number of ballots which were counted for the respondent, that is to say, in the election district known as Christiana north election district in Christiana hundred, there were thirty-seven ballots cast by persons who were not then residents *Page 510 
of said election district and were not qualified to vote therein, and thirty-seven ballots cast by persons who had not paid within two years a county tax which had been assessed at least six months before said election. That in the election district known as Christiana south election district in Christiana hundred, there were three ballots cast by persons who were not then residents of said election district and were not qualified to vote therein, and three ballots were cast by persons who had not paid within two years a county tax which had been assessed at least six months before the said election, and there were two ballots cast by persons who theretofore had been convicted of crimes deemed by law felony, and were thereby disqualified from voting therein" and all of which ballots were counted for the respondent. That in the election district known as the Seventh Election District of the City of Wilmington, there were thirteen ballots east by persons who were not then residents of said election district and were not qualified to vote therein, and thirteen ballots east by persons who had not paid within two years a county tax which had been assessed at least six months before said election, and all of which ballots had been counted for the respondent. That in the eleventh election district of the city of Wilmington there were thirty ballots cast by persons who were not then residents of said election district, and were not qualified to vote therein, and thirty ballots were cast in said election district by persons who had not paid within two years a county tax which bad been assessed at least six months before the said election; all of which ballots were counted for the respondent. And that the whole number of illegal ballots, so cast and counted for the respondent amounted to eighty-five votes, and if deducted from the whole number of votes cast for him in the county for the office, which was seventy-nine hundred and eighty-six, there would remain but seventy-nine hundred and one, or seventy-six votes less than the whole number of votes (seventy-nine hundred and seventy-seven) cast for the relator.
But as the counsel for the respondent, in their argument on showing cause against the rule, took the ground that inasmuch as the relator, in his affidavit to his petition and the foregoing *Page 511 
allegations contained in it, does not swear positively and directly to the truth of these statements upon his own actual knowledge of them, but only to his belief in them, which might have been, and doubtless was, founded on information merely, it could not be considered as sufficient proof of any one of the allegations contained in it as to any of the illegal votes which he asserts were cast and counted for the respondent, his affidavit to his petition being in the following words simply: "Before the prothonotary of this court comes Purnal J. Lynch, the petitioner above named, and being by me solemnly sworn according to law, says that what is contained in the foregoing petition, so far as concerns the deponent's act and deed, is true, and that what relates to the act and deed of any other person he believes to be true." It is apparent from the tenor of this, and marked discrimination between his own act and the act of any other person referred to in it, that so much of it as relates to the act of any other person or persons is based on hearsay and information merely, and it is equally apparent that he must have received, by hearsay from a number of persons present on that day in the several election districts mentioned, the information on which he rests his sworn belief that there were eighty-five illegal votes polled at them that day for the respondent. But it is not directly alleged anywhere in the petition that any of the alleged unqualified voters referred to in it voted for the respondent, but indirectly or by implication only is expressed in the allegation several times repeated in the same words, that there were so many illegal votes cast by unqualified persons in the election districts named, and that they were all counted for the respondent.
But the rule of law requires that the affidavits made in support of an application for an information in the nature of a writ of quo warranto shall be complete and sufficient in every respect, and contain positive allegations and a precise statement of the facts on which the prosecutor assails the title of the respondent to the office or franchise in question. Cole on Criminal Information, etc, 178; High's Ex. Leg. Rem., § 733; 3 Steph. N. P., 2460; King v. Newling, 3 T. R., 310; King v. Lane, 5 Barn. *Page 512 Ald., 488; Rex v. Sargent, 5 T. R., 466. And although such an affidavit to the following purport: that the deponent "understands and believes," or "has heard and believes," or "has been informed and believes," when it has reference to statements alleging a usurpation of the office merely, has been considered sufficient under certain circumstances, as where the usurpation was not denied by the respondent, who made no answer to the application, but the rule is otherwise when the allegations go to the validity of the title of the respondent to the office in question. Rex v. Harwood, 2 East., 177; Rex v. Blythe, 6 B. C., 240. And as in this case the allegations in the petition and affidavit of the relator go directly to the validity of the title of the respondent to the office in controversy, and there never having been any question or dispute from the inception of the proceedings, as to the fact that the respondent has been formally sworn in, and is now in full possession of and exercising the functions of the office, but which the relator alleges is by usurpation merely and without any legal right or title to it, under the rule of law before stated we must hold the affidavit of the relator to be insufficient to support any of the allegations contained in his petition in reference to the alleged illegal votes cast in the said several election districts mentioned in it. Besides, the weight and credibility of it as evidence in the case is justly subject to the animadversion that it is made in his own interest.
The other affidavit filed on behalf of the relator is that of Thomas Toy, and declares that on the day of the election he was present at the voting place in the said election district in Christiana hundred in said county, known as Christiana north election district, from the opening to the closing of the polls on that day; that on that day, and at the said voting place, there were cast thirty votes for James Martin for the office of sheriff of New Castle county by persons who were not then residents of the said election district, that none of said persons had within two years next before said election paid a county tax which had been assessed at least six months before the said election, but, in fact, they voted in said district on forged tax receipts. This, it *Page 513 
will be observed, relates only to the election in Christiana north election district, and excluding the affidavit of the relator as insufficient, for the reason before stated, it constitutes the only evidence we have before us to support the allegations of the relator in his petition ha regard to the illegal votes alleged to have been cast in any of the election districts mentioned in it. It is free, however, from the defect objected to and allowed against the affidavit of the relator, for it is direct and positive in its statements and purports to be based on his own knowledge, and not on his belief merely; but in considering the degree of weight and credit to be given to it, we must not overlook the fact that it does not agree with the affidavit of the relator in the number of illegal votes alleged by them respectively to have been cast for the respondent, even in the election district to which this affidavit only applies; for relator alleges the number to have been thirty-seven, but Mr. Toy only thirty. Now, whence this discrepancy, and how could it have occurred between the relator and his other only witness to the alleged illegal votings in that election district in a matter of vital importance to this prosecution? And does not such a disagreement in their statements warrant a grave doubt whether either of them is correct or reliable, because if the rule of law requires that the affidavit of the relator shall contain a precise statement of the facts upon which he relies to disprove the claim or title of the respondent to the office, it must, at the same time, be of no less importance to him that the facts alleged must be proved by clear and conclusive evidence, and that where he has but one witness to a most material fact alleged by him, the affidavit of that witness should be entirely consistent with his own.
But on the other side we have the answer and affidavit of the respondent. He alleges, also under oath, that at the general election held pursuant to law, on the 7th day of November last, he was one of the persons voted for as a candidate for the office of sheriff of New Castle County, and that the said Purnal J. Lynch and George J. Pennington were the other persons voted for as candidates for said office. That, pursuant to the statute in that behalf, the inspectors of said county met at the county *Page 514 
court-house in the city of Wilmington and county aforesaid, on the Thursday next following the said election, it being the 9th day of November last, together with the sheriff of said county, as a board of canvass, and did then and there canvass the returns made of the votes for the office of sheriff of said county, and the certificates returned by the inspectors were opened and read. That the said certificates were by the said board of canvass held and taken to be conclusive evidence of the result of said election, and that the votes shown by said certificates to have been cast throughout the said county for the office of sheriff, being calculated from the said certificates, the result was, that in said county deponent had received seven thousand nine hundred and eighty-six votes, and the said Purnal J. Lynch had received seven thousand nine hundred and seventy-seven votes, and George J. Pennington had received sixteen votes, and Thomas Ford had received one vote, and James Oldham had received one vote. That by the said certificates it appeared that deponent had received nine more votes for said office than the number received by the said Purnal J. Lynch. That the sheriff and eighteen (not sixteen, as stated in the petition of the said Purnal J. Lynch) of the inspectors present signed the two certificates that deponent had been duly chosen to the office of sheriff, as stated in said petition. That one of said certificates was delivered to the governor, who thereupon, on the 16th day of November last, duly commissioned deponent as sheriff of New Castle County, and deponent, having taken the oath of office, entered upon the performance of the duties of said office, and has since — to wit, on the 27th day of November last — entered into recognizance in the superior court in and for the county aforesaid, and now occupies and performs the duties and receives the emoluments of it. That this deponent is informed, and verily believes that at said election he was duly elected and chosen to said office by a plurality of all legal votes cast and counted for said office, and that he is informed, and verily believes, that no illegal vote or voles was or were cast and counted for him either in Christiana north election district or in any other election district in said county. That deponent is informed, and verily believes, that a *Page 515 
large number of illegal votes were cast and counted at said election for the said Purnal J. Lynch, and that deponent did, in fact, receive a much greater number than nine legal votes for said office more than the number of legal votes received for said office by the said Purnal J. Lynch.
The answer and affidavit of the respondent traverses and denies all the allegations of the relator as to the illegal votes cast and counted for him in the several election districts specified in his petition as fully and directly as it could have been done under the general terms in which the allegations are made, without naming any of the persons who are alleged to have so voted. There are also filed, on behalf of the respondent, the affidavits of five other persons, all of which relate exclusively to the charge made by the relator as to the illegal votes cast in the Christiana north election district, and the first of which presented and read to us was that of James J. Vincent, in which he states that he was the inspector of the election on that day in that election district, and, as such inspector, presided at it, received all of the ballots cast, and was present throughout said election from the beginning to the end of it, with the exception of about five minutes while he was eating dinner, but even then he was still seated in the room, with his face towards the window of it, through which the ballots were received and deposited in the box, and not more than ten or twelve feet from the window, and where he could still see all the ballots that were cast during that time, and during which time Charles Green, one of the judges of said election in said district, received the ballots at the window, but not above ten ballots were received during that interval. That he was in a position to see all the tickets or ballots voted at said election, and that there were not more than ten or twelve open tickets voted at it, with their face or list of candidates exposed to view, and that every one of the tickets so voted was headed with the words, "Democratic Party," and that no open ticket, with the names of the candidates thereon exposed to view, headed with the words, "Republican Party," were handed in to the said election officers or were voted at said election; but, on the contrary, every such ticket was folded when *Page 516 
voted, and so folded that the names of the candidates thereon could not be seen, and that it was impossible for Thomas Toy or any other person to see or know that any person voted for James Martin for sheriff, unless such voter showed him his ticket before he voted it. That the said Thomas Toy was not present at the said polls throughout the said election from the beginning to the close of it, but was absent therefrom several times, and in the aggregate about one hour, to the best of his belief. That there were eight hundred and twenty-one votes cast for the candidates for the office of sheriff at the said election in the said district; that he has an extensive acquaintance with the voting population of it, and verily believes that there were no illegal votes counted at said election for James Martin for said office, and to which he added, in his supplemental affidavit — taken two days afterwards — that he has no knowledge of any forged tax receipt or receipts having been used at said election as evidence of the qualification of any person or persons to vote, or for any other purpose; that the only ballot cast at said election which was not counted was a double ballot for said James Martin for sheriff, and that all the time the said Thomas Toy was present at the polls of the said election, as stated in his former affidavit, he was openly and actively canvassing in support of the election of the said Purnal J. Lynch to the said office of sheriff.
The next is the affidavit of the said Charles Green who says that he was one of the judges of election at the said election and was present at it in that capacity from the opening to the close of it, and presided over it during the time Mr. Vincent, the inspector, was eating his dinner, and received the ballots as they were handed in at the window, not more than eight or ten during that time. That he was in a position inside of the window during the whole election to see all the tickets or ballots as they were handed in at the window and deposited in the ballot box, and that he did not see at any time during the election upon any ticket or ballot handed in a heading for the Republican party, or the name of James Martin for sheriff, all such ballots being folded. That he has no knowledge of any forged tax receipt or receipts being used at said election as evidence of the qualification *Page 517 
of any person or persons to vote; and that he has an extensive acquaintance with the voting population of Christiana north election district, and verily believes there was not counted at said election in said district any illegal votes for the said James Martin for the office of sheriff, the only vote cast at said election and not counted being a double ballot for the said James Martin for said office.
The next is the affidavit of Geneal Henry Du Pont in which he states that he is a resident and qualified elector of Christiana north election district, and was present at the said election in it from the opening to the close of it, with the exception of about one hour when he was absent at dinner, and that during his presence at it as aforesaid he was standing close to the window through which the ballots were handed in to the election officers, engaged in scrutinizing the conduct of said election and watching the balloting, and was during his presence at the said polls as aforesaid in a position as advantageous for seeing the ballots as and when they were cast, as was that occupied by Thomas Toy, or by any other person, unless it might have been by the officers holding the election, and that he saw no ballot or ballots voted at said election with the names of the candidates thereon exposed to his view, or to the view of any other person, as he verily believes, outside of said window, nor, so far as he knows, to the view of any person inside of it. That he has an extensive acquaintance with the voting population of said election district, and has no reason to believe that there was cast at said election any illegal vote for James Martin for sheriff, with the exception of a double ballot which he has been informed was cast, but not counted for him by the officers of. the said election. And that he has no knowledge that any forged tax receipt or receipts was or were used at said election, as evidence of the qualification of any person to vote at it; that Thomas Toy was not present at said polls during the whole time of the said election, but on the contrary he departed several times therefrom and was absent from the window of said polls while he was there, in the aggregate during said election upwards of one-half hour to the best of his recollection; and whilst there that he was *Page 518 
openly canvassing in support of the said Purnal J. Lynch for the office of sheriff. And in addition to these there are on behalf of the respondent the affidavits of Joseph Knox and Benjamin F. Sheppard, both residents and qualified electors of the said election district, in which they each respectively depose to a statement of facts substantially the same as the statement contained in the affidavits last read.
Now, if upon these affidavits for and against the application we were in our discretion to order this case to a trial before a jury would it not be very much like going back to the days in the courts of England spoken of by Lord Mansfield, when as he said such could almost have been had for the asking, and if he and the judges of the Court of King's Bench of that day would not permit the peace and quiet of a municipal corporation or the office of a mere bailiff of an English borough to be so disturbed without strong and sufficient grounds in the opinion of the court to invalidate his title to it, should this court be less strict or remiss in the observance of the same wise and salutary rule of law and practice, when the validity of an election to the sheriff's office of this great county is the subject of inquiry moved for in the case? And if the precedent were once set to the contrary on light and frivolous, or insufficient grounds and proof presented on the affidavits, where would it end, particularly in cases of closely contested elections for the office resulting in a small majority or plurality of the popular vote either way, as in the present instance. The desire is very strong and the temptation very great on the part of the defeated party to get rid of such a result, and resort to any means and to strain any evidence in their power to accomplish their purpose of avoiding it.
We have in the affidavits the testimony of five witnesses for the respondent to one for the relator, two of the former officers of the election in question, and all of them resident in the said election district, and extensively acquainted with the voting population of it, against the testimony of a single witness on the other side who is also a resident in the said election district, but who mentions no names and gives us no information of how he acquired his singular knowledge that thirty of the persons who *Page 519 
voted at the said election for the respondent for sheriff, were not then residents of the said district, as he alleges, the first inquiry naturally presented by it for our consideration, how could that have been done without any one of the five witnesses learning anything about it. Thirty non-residents is certainly no small number to vote at the polls of a rural election district, and that too without its coming to the knowledge apparently of but one single voter of either party at the polls that day; and it certainly does not lessen the singularity or improbability of it, that no one, not even, the witness, Toy himself, made any objection at the polls to vote of any of them upon that or any other ground, as we are warranted in inferring in the absence of any allegation by him or of any other witness to that effect.
The learned counsel for the relator seemed not to be unconscious of the weakness and infirmity of his proof on this point, and sought to palliate and excuse the deficiency of it on the ground that they were obliged to depend on voluntary affidavits solely, and had no power by legal process to compel any person to testify in such a case. But such is the law and the practice in such case, and it proceeds on the ground that it is not reasonable to suppose that any other person in the said election district favorable to the election of the relator, having knowledge of the alleged fact that he had been cheated and defrauded out of an election to the office in question by thirty or any smaller number of illegal votes cast for the respondent, he would not have hesitated to depose to such knowledge, as soon as called upon for it. And the more strongly are we convinced of it by the loud clamor which was raised over this matter when the board of canvass met, and by which I regret to say nearly one-half of its members were so much excited and transported by these charges and allegations of fraud and illegality, that they were prepared in their official capacity to perpetrate a more flagrant usurpation upon the powers of the legislature, and the jurisdiction of this court in the premises, in order to prevent the consummation of such an apprehended fraud, than even the alleged usurpation upon the rights of the State which we are now considering in the proceeding before us. For their sole power and duty when assembled *Page 520 
as a board of canvass was purely ministerial in the premises. It simply was to ascertain from the certificates of elections returned to it by the inspectors of election in the hundreds and election districts of the county, the state of the election throughout the county, by calculating or adding up the aggregate amount of all the votes which had been given for each office in all the hundreds and election districts in the county, for every person voted for such office, and after the state of the election throughout the county had thus been ascertained by calculating all the votes as before stated, then before any adjournment or separation of the board, to make under their hands their certificates of such election, as provided for and required of them by the statute in that behalf. Rev. Code, 124; The People v. Van Slyck, 4 Cow., 297. The statute does not expressly provide or require, although it manifestly imports we think, that all the members of the board of canvass present should concur and unite in the performance of this purely ministerial function, and in the due and proper discharge of the duty thus imposed upon them, there certainly seems to be no ground whatever for any honest difference of opinion among the members of it who were familiar with the first and most simple rule in arithmetic, and possessed sufficient intelligence on the subject to properly apprehend the obvious legal limit of their official power and authority in the premises. But as the dissenting members of the board were so clearly wrong in declining to join with the majority of it in the certificate of the election of the respondent to the office in question, and in the unlawful course which they adopted on the occasion, it is not entitled to, and of course, cannot have any weight or effect whatever on the decision of the legal question now addressed to the sound discretion of the court in the case, that is to say, whether the respondent was duly elected to the office in question at the general election held in the county on the 7th day of November last, and whether we have sufficient evidence to the contrary now before us to entitle the relator who also claims it, to an information in the nature of a writ of quo warranto, to try that question before a jury at the bar of this court. *Page 521 
And here the first and only question which we consider necessary to determine is this. Is there sufficient evidence before us in the affidavits of the relator and Thomas Toy, the former wholly uncorroborated by the latter in any of its allegations, except as to the illegal votes alleged to have been cast for the respondent in Christiana north election district, and only in part supported by it in relation to that election district even, and that to with the material variance and discrepancy existing between them before noticed, and with the latter affidavit, not only wholly uncorroborated by any, but is directly contradicted by all the affidavits filed, on behalf of the respondent, no less than five in number? To this question we must unhesitatingly answer that there is not sufficient evidence to require us in the exercise of a sound discretion with which we are clothed by law on such an application, to grant the leave asked for to file the information, and it is therefore denied. *Page 522